whole number of years) which is equal to the number of computation periods during which the Employee has at least 1,000 Hours of Service, subject to the following rules: * * *

> (c) Pre-Plan Service. If the Employer so elects in the Adoption Agreement, Vesting Service will be credited (under the rules of this Plan Document) for computation periods before the Employer first maintained the Plan (or a predecessor plan). Otherwise, such prior computations periods shall be disregarded.

* * *

SECTION 5
VESTING

5.1.1. General Rule. Each Participant's Regular Account will become Vested under the rules specified in the Adoption Agreement.

5.1.2. Automatic Vesting. Notwithstanding any rules specified in the Adoption Agreement, each Participant's Regular Account will become fully (100%) Vested upon the occurrence of any of the following events while he or she is and Employee of the Employer and its Affiliates:

(a) Death,

(b) Disability,

(c) Attainment of Normal Retirement Age,[7]

(d) A partial termination of the Plan which affects the Participant, or

---

[7]"Normal Retirement Age," under this particular Plan, is sixty-two years of age. See, Adoption Agreement, at Section D.

(e) A complete termination of the Plan or a complete discontinuance of Employer contributions to the Plan.

* * *

SECTION 13
MISCELLANEOUS

* * *

13.3 Interpretation of Plan Document. In interpreting the Plan Document and administering the Plan, there will be no discrimination in favor of Highly Compensated Employees (as defined below), the occurrence of which would adversely affect the qualification of the Plan under Code section 401(a). * * *

"Highly Compensated Employee" means an individual described as such in Code section 414(q). Unless otherwise provided in Code section 414(q), each Employee who meets one of the following requirements is a "Highly Compensated Employee":

> (1) The Employee was a 5% owner (as defined in Code section 414(q)(2) at any time during the current Plan Year or the 12-month period preceding the current Plan Year * * *.[8]

Plan Document, at 1-2, 4, 6, 17, 36.

---

[8]Title 26 U.S.C. §414(q)(2) provides that "[a]n employee shall be treated as a 5-percent owner for any year if at any time during such year such employee was a 5-percent owner (as defined in section 416(i)(1)) of the employer." In turn, Title 26 U.S.C. §416(i)(1) provides that, when an employer is not a corporation, such as in the circumstances of this case, a "5-percent owner" is "any person who owns more than 5 percent of the capital or profits interest in the employer." According to the partnership meeting notes for December 12, 2000, the Law Firm divides their profits as follows: Thibodeau, 34.2%; Johnson, 24.3%; Feriancek, 20.6%; Costley, 20.9%. See, Ex. D to Bratvold Aff.

Under the terms of the Adoption Agreement, the Plan's Vesting Rules rely on Graded Vesting, which produces the following percentages of vesting:

| Years of Service | Vesting Percentage |
|---|---|
| Less than 2 | 0% |
| 2 but less than 3 | 20% |
| 3 but less than 4 | 40% |
| 4 but less than 5 | 60% |
| 5 but less than 6 | 80% |
| 6 or more | 100% |

Adoption Agreement, at Section D.

The Defendants argue that their interpretation of the Plan was reasonable, and that, under an abuse of discretion standard, their construction must be upheld. In the alternative, they assert that, even under a de novo standard of review, in accordance with the plain language of the Plan, Costley was not vested, at all, at the time of his resignation from the Law Firm, as he had only worked a little over one year for the firm.

Costley similarly argues that the Plan is **un**ambiguous, but he contends that, under the plain language of the Plan, his service at Johnson Killen is counted toward his vesting service. In particular, he points to a portion of the Adoption Agreement where the Defendants checked the "yes" box for the following question:

> Vesting Service: Will vesting service include years before the Employer first maintained the Plan (or a predecessor plan)?

Id.

Thus, because the Plan was deemed effective on the day that the Law Firm was established, Costley contends that the Law Firm would not have checked the "yes" box if it had not intended previous service, at Johnson Killen, to count towards "vesting service." Consequently, Costley believes that he is entitled to his benefits, and he also seeks a grant of Summary Judgment. In the alternative, should we conclude that the Plan is ambiguous, he asserts that there are genuine issues of material fact, concerning the partners' intent in forming the Plan, which would preclude the grant of Summary Judgment to either party.

As we have explained, under an abuse of discretion standard, "the plan administrator's plan construction will be upheld, if reasonable." Buttram v. Central States, S.E. & S.W. Areas Health and Welfare Plan, supra at 901. In determining whether an interpretation is a reasonable exercise of discretion, the Court is to consider:

> 1. Whether the interpretation is consistent with the goals of the Plan;
>
> 2. Whether the interpretation renders any language in the Plan meaningless or internally inconsistent;
>
> 3. Whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute;
>
> 4. Whether the administrators have interpreted the words at issue consistently; and,

5. Whether the interpretation is contrary to the clear language of the Plan.

Finley v. Special Agents Mutual Benefit Ass'n, Inc., supra at 621; see also, Wald v. Southwestern Bell Custom Care Med. Plan, supra at 1007 (applying Finley factors).

The first, third, and fourth Finley factors, have no real bearing on this case, as the only expressed goal of the Plan was to obtain tax benefits, which was not affected by the Trustees' determination;[9] there is no allegation that the Trustees' interpretation of the Plan conflicts with any substantive or procedural requirement of the ERISA statute; and, Costley's demand for benefits was the first instance in which the Trustees' were called upon to interpret the Plan. As such, we turn to the remaining two factors, which are the crux of the dispute before us.

The focus of the parties' contentions relates to whether the Trustees' interpretation of the Plan renders any language in the Plan meaningless, or internally inconsistent, and whether it is contrary to the clear language of the Plan. See, Finley v. Special

[9]It appears that there was a secondary "goal" of the Plan. As Costley himself concedes, part of the reason for making vesting under the Plan graded was "to give current and new employees at the firm an incentive to continue their employment with the firm." Costley Aff., at ¶5. In fact, as Kolquist stated, "[o]ne of the common reasons for a vesting schedule is to provide an incentive for employees to continue working for the same employer." Kolquist Aff., at ¶11. Clearly, given the fact that the Law Firm wanted to encourage its employees to remain with the firm, the Trustees' decision to interpret the vesting provisions of the Plan, so as to include only the years of service with the Law Firm, comports with that goal.

Agents Mutual Benefit Ass'n, Inc., supra at 621. Our analysis, under the two factors, is intertwined, and therefore, we address them together.

Both parties assert that their respective interpretations of the Plan give full effect to the entire Plan, and that their interpretations are consistent with the clear language of the Plan. As we previously determined, in regard to the Defendants' Motion to Dismiss, the Plan itself does not specifically prohibit counting years of service with Johnson Killen in determining vesting service.[10] In particular, Section 1.30(c) of the Plan provides as follows:

> Pre-Plan Service. If the Employer so elects in the Adoption Agreement, Vesting Service will be credited (under the rules of this Plan Document) for computation periods before the Employer first maintained the Plan (or a predecessor plan). Otherwise, such prior computation periods shall be disregarded.

Plan Document, at 6.

[10]Since the time of the Motion to Dismiss, the parties' arguments have been modified, and clarified, considerably, and we have had occasion to consider intervening law. The key distinction between our analysis here, and that which proceeded on the Motion to Dismiss, is what significance we can extend to Costley's extrinsic evidence. Under Rule 12(b)(6), some allegations of a Complaint may have a different appearance, than when the issues are more fully briefed, and honed, under Rule 56.

Given this language, Costley maintains that, by checking the "yes" box as to "Vesting Service," the intent was to count previous years of service, with Johnson Killen, for the purpose of vesting.

Moreover, according to Costley, if, by checking the "yes" box for "Vesting Service," the Trustees, including Costley, did not intend to count previous service with Johnson Killen, then there is an internal inconsistency in the Plan, as there would be no reason to check the "yes" box if the previous service with Johnson Killen was not to be considered. More specifically, Costley contends that previous service with the same employer in this case, the Law Firm, was not possible because the Law Firm was created on January 1, 2000, and, although the Plan was signed on December 15, 2000, its effective date was January 1, 2000. See, Adoption Agreement, at Section D. Therefore, as urged by Costley, checking the "yes" box, as to "Vesting Service," would be useless under the Defendants' interpretation, and would render that clause nugatory.

In contrast, the Defendants allege that they checked the "yes" box in order to ensure that the entire year of 2000 was counted for vesting purposes. Their reason for doing so was that, although the Plan was made effective on the date that the Law Firm was created -- that is, on January 1, 2000 -- the question, to which the "yes" responded, specifically asked whether "Vesting Service [would] include years before the Employer first **maintained** the Plan (or a

predecessor plan)." Id. [emphasis added]. The Defendants contend that there is a difference between when the Plan was first "maintained," and when it was "effective," which caused them to check the "yes" box, assertedly at the behest of Kolquist and Liberty. See, Feriancek Aff., ¶6; Johnson Aff., at ¶6.

Quite plainly, there is a significant dispute as to the Trustees' intent in checking the "yes" box, under "Vesting Service." Costley contends that the Trustees never even considered whether "effective" equated with "maintained" in the Plan, and that the Trustees decided to check the box because they wanted to ensure that previous service, with Johnson Killen, was counted for vesting purposes. Johnson and Feriancek urge just the opposite -- there never was a discussion regarding counting previous service at Johnson Killen, for purposes of vesting, and they specifically checked the "yes" box for "Vesting Service" because, at the behest of Liberty and Kolquist, they wanted to ensure that the entire year 2000 counted for vesting purposes. Both sides encourage us to consider extrinsic evidence, so as to address the issue of intent, but, given the trust principles, under which we are to construe ERISA plans, as well as the principles of contract law, which guide that construction, we may not resort to such evidence unless we find an ambiguity in the language used. "A term is ambiguous if it irreconcilably conflicts with other terms in the contract." Chris-

tianson v. Poly-America, Inc., 2002 WL 31421684 at * 3 (D. Minn., October 25, 2002), citing, among other authorities, Barker v. Ceridian Corp., supra at 635, and Jensen v. SIPCO, Inc., supra at 949. We find no ambiguity at play here.

When reviewing the Trustees' decision, under the abuse of discretion standard, the key question is whether their interpretation was reasonable. As a part of that review, we must look to whether the Trustees' interpretation conflicts with the plain language of the Plan, or whether it renders any provision in the Plan unnecessary. In this case, when the Plan is read as a whole, it is clear that the Trustees' determination does not conflict with the plain language of the Plan, and that it does not irreconcilably conflict with any other provision of the Plan.

In contrast to Costley's suggestion, no provision of the Plan is rendered meaningless, or unnecessary, by the Defendants' interpretation of the Plan. Although the Plan was made effective as of the date the Law Firm was established -- January 1, 2000, see, Adoption Agreement, at Section B -- the "Vesting Service" question referenced any service prior to the time that the Employer "maintained" the Plan. Id. at Section D. "Maintained" does not equate with "effective." Rather, according to the dictionary, "maintain" has the following meanings:

> 1: to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline (~ machinery) 2: to sustain against opposition or danger: uphold and defend (~ a position) 3: to continue or persevere in: CARRY ON, KEEP UP (couldn't ~ his composure) 4a: to support or provide for (has a family to ~) b: SUSTAIN (enough food to ~ life) 5: to affirm in or as if in argument: ASSERT (~ed that the earth is flat).

Merriam-Webster's Collegiate Dictionary at p. 700 (10th ed. 2001).

In contrast, "effective" means:

> 1a: producing a decided, decisive, or desired effect b: IMPRESSIVE, STRIKING (a gold lamé fabric studded with ~ * * * precious stones -- Stanley Marcus) 2: ready for service or action (~ manpower) 3: ACTUAL (the need to increase ~ demand for goods) 4: being in effect: OPERATIVE (the tax becomes ~ next year) 5: of a rate of interest: equal to the rate of simple interest that yields the same amount when the interest is paid once at the end of the interest period as a quoted rate of interest does when calculated at compound interest over the same period -- compare nominal.

Id. at p. 367.

As employed in the Plan, and as would be understood "by a reasonable person in the position of a plan participant," the date that the Plan is "maintained" relates to the funding, or sustaining of the Plan, while the "effective" date of the Plan relates to when the Plan becomes operative, or goes into effect. Here, the Plan was not funded, or maintained, until December of 2001, while the Plan was retroactively made effective as of January 1, 2001. As such, the two terms are not synonymous, and the Trustees' interpre-

tation does not render the "Vesting Service" provision extraneous or meaningless. This is not to say that a legal interpretation of the Plan required the checking of the "yes" box, but where, as here, the question could arise, among Plan participants, as to whether the period, between the "effective" date and the date on which the Plan was first "maintained," would count toward vesting, this provision makes that period of vesting expressly clear.

Moreover, the Trustees' interpretation also comports with the remainder of the Plan. Under the plain terms of the Plan, "Vesting Service" is defined as the employee's "hours of service" with the Employer, and its Affiliates. "Hours of Service" only contemplates an employees' "service with the Employer and all Affiliates." Clearly, Costley has not completed enough "hours of service" with the Employer -- the Law Firm. Furthermore, Johnson Killen could not be an "Affiliate," as there is no assertion, by Costley, that the two firms are under "common control,"[11] or that Johnson Killen is a predecessor to the Law Firm, as the Law Firm "does [not] maintain[] a plan of such predecessor business entity." Finally, there is no allegation that some other statutory provision makes Johnson Killen an "Affiliate." Indeed, Costley can legitimately make no

[11]The only named partner with the Law Firm who was also a partner at Johnson Killen is Thibodeau.

such argument, as there is no portion of the Plan which so much as mentions Johnson Killen.[12]

In addition, the Trustees' interpretation is concordant with another provision of the Plan, which would have been violated given Costley's recollection of the asserted intention to check the "yes" box. Specifically, four of the five individuals, who had previously worked at Johnson Killen -- Thibodeau, Costley, Feriancek, and Johnson -- would be considered "highly compensated employees," as they apparently agreed to each share more than 5% of the profits

---

[12]To exalt the "yes" box, over all the other provisions of the Plan which make Costley's interpretation untenable, by equating Johnson Killen as an "Employer," does violence to the principles of contract law which we have detailed, and which govern our interpretation of the Plan provisions. In addition, it would permit the "oral modification of employee welfare plans governed by ERISA, a result manifestly in conflict with the intent of the statute and with the case law governing it." Farley v. Benefit Trust Life Ins. Co., 979 F.2d 653, 660 (8th Cir. 1992); see also, Walker v. Nat'l City Bank of Minneapolis, 18 F.3d 630, 634 (8th Cir. 1994), citing Title 29 U.S.C. §1102(a)(1); Paul Revere Life Ins. Co. v. Vandenplas, 1992 WL 320994 at *6 (D. Minn., October 27, 1992)("If the wording of employee benefit plans is unambiguous, ERISA precludes recovery based on oral modifications of such plans.").

Most of Costley's arguments, for committing such violence, are long on advocacy, and short on substance. As but one example, Costley provides no explanation as to why prior service at Johnson Killen should be credited for vesting -- in the absence of any provision in the Plan which would recognize Johnson Killen as an "Employer" -- while a Plan participant's prior service at some other law firm than Johnson Killen would not. Rather, Costley suggests that, if another Plan participant wanted to make such a claim, then the Plan language would be ambiguous, but not as to Costley. Plaintiff's Memorandum, at pp. 17-18. To characterize the argument as a semantic gloss is purely understatement.

of the Law Firm. See, Ex. D to Bratvold Aff. (meeting notes recollecting approval of profit sharing percentages for the partners as follows: Thibodeau, 34.2%; Johnson, 24.5%; Feriancek, 20.6%, and Costley, 20.9%). As such, by counting prior service at Johnson Killen, the Trustees would be treating all of the "highly compensated employees" disparately with all but one of the remaining six employees. Thus, if the Trustees had interpreted the Plan to include prior years of service with Johnson Killen, for purposes of vesting service, then they would have violated Section 13.3 of the Plan.

As a consequence, when read as a whole, we conclude that the Trustees' interpretation of the Plan does not render any provision of the Plan meaningless, and is consistent with the Plan language. Of course, in finding no ambiguity in the Plan language, we necessarily extend less deference to the Trustees' interpretation, as the determination as to whether a contract term is ambiguous, or not, "is a question of law." Hughes v. 3M Retiree Medical Plan 134 F. Supp.2d 1062, 1068 n. 12 (D. Minn. 2001), aff'd, 281 F.3d 786 (8th Cir. 2002), citing Lehman Bros. v. Clark Oil & Refining Corp., 739 F.2d 1313, 1317 (8th Cir. 1984); see also, Cooper v. Lakewood Eng'g & Mfg. Co., 874 F. Supp. 947, 953 (D. Minn. 1994)(holding that, when a contract term is unambiguous, its interpretation is a question of law). Here, we conclude that the Trustee's interpreta-

tion is not only reasonable, but it is the proper interpretation as a matter of law. Accordingly, the Defendants Motion for Summary Judgment is granted.

B. The Defendants' Motion for Attorney's Fees. The Defendants have also requested that the Court award them Attorney's Fees for having to defend against this action. The applicable provision is Title 29 U.S.C. §1132(g)(1), which provides as follows:

> In any action under this subchapter (other than an action described in paragraph 2) by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

Generally, only the prevailing party can receive an award under Section 1132. See, Bittner v. Sadoff & Rudoy Indus., 728 F.2d 820 (7th Cir. 1984). Further, as noted in the language of the statute, such an award is discretionary. See, Maune v. IBEW, Local No. 1, Health and Welfare Plan, supra at 964; Jacobs v. Pickands Mather & Co., supra at 659. As the Court, in Jacobs, elaborated:

> In exercising its discretion, a Court should consider the following factors: '(1) the degree of the opposing parties' culpability or bad faith; (2) the ability of the opposing parties to satisfy the award of attorney's fees; (3) whether an award of attorney's fees against the opposing parties could deter other persons acting under similar circumstances; (4) whether the parties requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA it-

> self; and (5) the relative merits of the parties' positions.'

Jacobs v. Pickands Mather & Co., supra at 659, quoting Lawrence v. Westerhaus, 749 F.2d 494, 495 (8th Cir. 1984).

These are not factors which are to be mechanically applied but, rather, we are to "use the factors and other relevant considerations as general guidelines for determining when a fee is appropriate." Martin v. Arkansas Blue Cross & Blue Shield, 299 F.3d 966, 972 (8th Cir. 2002), cert. denied, --- U.S. ---, 123 S.Ct. 967 (2003). Our Court of Appeals has recently clarified, however, that there is no presumption in favor of awarding fees to a prevailing party. Id.

On the Record presented, we conclude that this is not an appropriate occasion for the award of attorney's fees. First, we have no evidence that Costley was motivated by bad faith in bringing this cause of action, although his belated concession, that he did not wish to maintain actions against Johnson, and Feriancek, in their individual capacities, does give us pause. Nonetheless, he ultimately acceded to their dismissal. Further, Costley appears to have been strongly influenced by his recollection of extrinsic events, which we have found to be legally irrelevant under the circumstances presented here. Although we find his interpretation of the Plan provisions, which are here at issue, to be implausible, and legally without merit, his proffered interpretation is not

wholly without an arguable basis. Simply put, Costley can be wrong without being in bad faith.

Moreover, other than the Defendants' bald assertions, we are presented with no evidence that Costley is positioned, financially, to satisfy an award of attorney's fee. A facile award of fees against an ERISA claimant could chill the Statutes salutary remedial purposes, which would cause us great concern. While deterrence of frivolous lawsuits is warranted, here Costley's claims survived a Motion to Dismiss, albeit in a dialectic that was not as focused, and informed, as the parties advanced on the cross-Motions for Summary Judgment. Nor can we say that this litigation "resolve[s] a significant question regarding ERISA itself." While the Defendants position "sought to benefit all participants and beneficiaries of an ERISA plan," in that it was designed to protect the integrity of the Plan, the same may be said in any case involving a denial of ERISA benefits.

In sum, while the issue is somewhat close, we find that an award of attorney's fee would be an inappropriate exercise of our discretion, on the facts presented, and therefore, we deny the Defendants' request for attorney's fees.

NOW, THEREFORE, It is --

ORDERED:

1. That the Defendants' Motion for Summary Judgment [Docket No. 19] is GRANTED.

2. That the Defendants' Motion for Attorney's Fees [Docket No. 19] is DENIED.

3. That Judgment for the Defendants, and against the Plaintiff be entered by the Clerk of Court.

BY THE COURT:

Raymond L. Erickson
UNITED STATES MAGISTRATE JUDGE